The United States Court of Appeals for the Eleventh Circuit is now open to the Court of the Law. God bless the United States and this Honorable Court. Be seated please. Good morning. The Court calls the case of Mr. Robert Rimmer v. Secretary, FL DOC and Ms. McDermott. Good morning. May it please the Court. Linda McDermott on behalf of Mr. Rimmer. There are two issues before the Court. I apologize on your name. McDermott. Hello. Oh, no problem. It's okay. I said McDermott. It's okay. That's okay. Thank you. So, there are two issues before the Court. The first... We know who you are and we're happy to answer. Good to hear. So, as to the second issue, which relates to the ineffective assistance of counsel at the penalty phase, I anticipate that Mr. Rimmer will receive first relief from the Florida Supreme Court at some point or from the State Circuit Court. And we have a case management conference scheduled later this month on that particular issue. The Florida Supreme Court has been very consistent about granting relief to those individuals who are post-ring with non-unanimous jury recommendations, and Mr. Rimmer falls into that category. So, I don't plan on spending any time on that issue today, and I actually would ask that perhaps the Court hold off in ruling on that until the State Court has had an opportunity to... Do you have a sense of timing on that? I know it's hard for you to predict, but from the conferences you've had, do you have a sense of when you might get something from the Florida Supreme Court on that issue? Sure. So, our case management is now set for June 26th, where we'll argue the motion before the State Circuit Court. I have not had a Circuit Court judge reject the claim based on the Florida Supreme Court's case law. And the State has now dropped the appeals in all of... I know in all of my cases and many other cases that they had filed relating to the relief that had been granted under those circumstances. So, my position is, is this is going to be a case that gets rescheduled for a resentencing proceeding by the State Courts, and I anticipate... Without an appeal? Without an appeal. From the AG to the Supreme Court, so you might have an answer early this summer. I think that this will be resolved, and the trial proceedings will start happening probably in August. I would imagine that he'll have an attorney appointed for him. So, you mean there'll be a new sentencing trial? Yes, he will get a new sentencing proceeding under Hearst. So, your point is that the Brady issue goes to the conviction, and the ineffective assistance claim goes to the sentencing? Correct. I mean, I can see how Brady... But the sentencing issue will truly become moot as soon as the relief you seek, if it's granted... So, unless the court has any questions about that particular claim, I don't anticipate... I do, but it's about the status of the Florida Supreme Court decisions. I know they came out with one opinion dealing with retroactivity. I've forgotten the name. What was it? So, there were Mosley and Acey. It came out on December 22nd. Okay. Mosley was a post-ring case that granted him retroactive application of Hearst v. Florida and a new penalty proceeding. Okay, and Acey was a pre... Acey was a pre-ring case, yes. And got no relief. He got no relief. Okay, all right. Let's go to the post-ring cases of which your case is one. Yes. And I thought, and in the earlier opinion, maybe it's not either one of these, or maybe it's just from the United States Supreme Court opinion, that if you had two murders... Okay, and maybe this is going to be self-answering actually by the time I answer it. If you have two murders, that you still could have death even though you didn't have a finding on the aggravator. But what I think you're going to say is this case has not only that issue, no finding on the aggravator, but it's the lack of unanimity. Correct. So, it doesn't even matter. The other issue about having two murders and the aggravating factor doesn't matter here. Right. Okay, so it would just be on the... Lack of unanimity. Lack of unanimity on the... Yes, as to the harmlessness. And is the state retrying these cases, or is it one by one they're making decisions? It's fairly early. I've had a few of these where counsel's been appointed, but they're so early in the proceedings, I don't know what the result will be. Okay. So, in that respect, just to start with the Brady then, as far as the Brady claim goes, the district court found that there were two sort of areas... I'm sorry, one more question. Sure. As I understand it, Lambrex has not been decided. No, Lambrex was denied by the Florida Supreme Court, and I believe the re-hearing's also been denied. So, he has not yet filed his cert petition to the U.S. Supreme Court, though. But that's been denied because he's a pre-ring. He's pre-ring. He's pre-ring, so he wouldn't get the benefit. Not under the... Not the way the Florida Supreme Court is. The way that it's currently set up. Okay. Thank you. So, as to the Brady, there's these documents that were not disclosed from the Florida Department of Law Enforcement that indicated that there were other suspects in the crime, and they had pulled the booking photos of those particular individuals. There were three of them and placed them into lineups to be shown to the eyewitnesses in this case. That does not appear to have happened, or if it has happened, it was not revealed to trial counsel through the pretrial investigation that he conducted. The second piece of information related to a crime that occurred just a few days before this particular crime, which was similar enough in that the law enforcement reached out from the Plantation Police Department to the Wilton Manors Police Department and wanted to show Mr. Rimmer's photograph and get his fingerprints so that they could determine whether or not he was involved in that particular crime. And in those records, there's also reference to another robbery where there was no homicide in that case, but there was a robbery at another similar kind of situation where there's an auto repair store, where there's bay areas set up and someone came up while customers and employees were in that bay area and committed a robbery. I'm concerned about whether the district court should have reviewed this de novo instead of giving deference. So the district court reviewed this de novo, and it seemed to me that its analysis was flawed in that it said . . . Let me see if I can . . . The court was unaware of any clearly established federal law that allowed a court to credit the testimony of trial counsel when the defendant was also pressing an ineffective assistance claim. That seems to me to be wrong. Well, so what happened in the state trial court and then in the floor of the Supreme Court was the court had indicated that because trial counsel had said, I wouldn't have used this information or I don't see the point of some of this, that that would then make it so that it was not exculpatory or impeaching and . . . It could have reasonably concluded . . . it could credit that testimony, right, and nevertheless . . . and also conclude based on this record with this evidence of guilt that that was right, right? Well, I don't doubt that . . . Well, here's the problem is the trial counsel who didn't have that information when he was trying the case eight years prior was suddenly put in a position where he was being asked, what does this mean to you in terms of your theory and how could you have used it? And so he was . . . he was certainly not a . . . He was a hostile witness really to Mr. Rimmer by that point, and he indicated that he wouldn't have used it even had he had it. But this is someone who's had no time to think about it or investigate it further or ask anybody any questions about it. So while he could be credited in saying that, at the end of the day, his take that it's not material is clearly rebutted by the evidence, and that's what the district court found because she said that this is impeaching of Detective Lewis. It does show that there were these other things happening in the pretrial in terms of the eyewitness identification that he didn't acknowledge in his deposition or in his trial testimony. So I think that that's where she was saying, not necessarily entirely based on trial counsel sort of disregarding it, but also that what he was saying is rebutted by the actual evidence, by these actual documents. And even in . . . she found that the documents about the prior robbery homicide was also . . . would have also been helpful and material to Mr. Rimmer. And so, again, that just rebutted what trial counsel had said, his testimony. How would it have been helpful? Because in that case, if you look at the records from that case, what you have is you have a three-person robbery happening where, similar to what happened here, where someone approaches the Bay Area where the work is being conducted and the employees and customers are there, and takes their jewelry, takes their wallets, tells them to get the cash out of the cash register, and then leaves. And there's a getaway driver and there's a lookout. So we have . . . Do you know how many robberies there are in the county and in the state that more or less mimic that MO? Two or three folks go into a store. The store is involved in commerce. They stick up the store either for cash or goods or both. Someone gets shot. Someone dies. They get in a getaway car and they split. There's very common MO. What is it that ties this Meineke muffler robbery sufficiently closely to this one that would have compelled or required a trial court to have allowed that in? If all you had was there was a robbery, it occurred within a week of this robbery. Someone was shot and killed in both of them. The valuables were made off and they got away in getaway cars. There's nothing else in common. Or maybe I'm missing it. Maybe there is something else in common. I think certainly one factor is the timing can be certainly considered a common feature. But then also the fact that Plantation Police Department wanted to actually show its eyewitnesses Rimmer's photograph and they wanted to look at Rimmer's fingerprints, they believed there was enough to look at him in their crime. Likewise, then, if you were trying the case, certainly you could argue that trial counsel could have looked at this case and presented something. And there is another thing. I don't know how that undermines at all, though, all the evidence that tied Rimmer to this crime. Right? Right. I mean, so what if there was another person involved? So whether he was involved in the plantation or not, there was a lot of evidence that ties him to this crime. And the question for materiality is whether that, we'll call it braiding material, would undermine confidence in this verdict. Right? Right. So that comes to sort of our prejudice analysis. And I don't think at the trial— The materiality inquiry is a lot like a prejudice analysis, isn't it? Certainly. Yes, certainly there's some overlap. But I guess my point is that when you look at what the theory of defense was, it was that I'm not disputing he had the evidence from the robbery. I'm not disputing that he rented that storage unit five days after the robbery. And the gun and all that. And then he led them on a high-speed chase. And that there was an artist sketch that looked like him. Right. Well, putting aside the eyewitness for one second, everything other than that doesn't put Rimmer into the crime until after the fact. The fingerprints, there's nothing tying him to the crime scene. We know that the shooter supposedly touched the cash register, touched the shelving. And yet those fingerprints don't match him. And we know that— I thought he discarded four items from the car as they were chasing him, correct? I know he had the wallet of one of the witnesses. He had the wallet. He had the gun from the cash drawer. His gun. He had his gun. That was the gun used in the murder. Right. He had that weapon. Is it only three items? I was thinking there were four things. I thought there were three. But then he's also seen on the video with all of the— With the storage unit. Right. Just take the three things he throws from the car that tie him directly to being the shooter. I mean, how is that not just overwhelming evidence? That he's got Moore's wallet, and he's got the gun in the murder, and he's got the gun that was stolen during the robbery. Help me with that. Is it just that it's after the fact? Well, it's after the fact. And he had— Not yet, though? I mean, is that the— Right, because there's nothing tying him to the crime scene. Why doesn't that tie him to the crime scene? I'm sorry. There's nothing putting him at the crime scene in terms of, like, forensic evidence or, you know, something that's left there that you can say— So somebody gave all these three things to him after the crime. Right. That was the theory. He's just the after-the-crime custodian of all the criminal evidence. The defense counsel— And he's in the same car that was seen at the crime, right? He's in the four— Well, the same kind of car. He does own a car similar to the one that was identified at the crime. I mean, trial counsel characterizes him as the patsy, that he comes into the evidence after the fact and that he didn't have anything to do with the actual robbery or homicide. Now, I just want to talk about Kiles v. Whitley because the facts in that case, when you look at what was presented at Mr. Kiles' trial, was four eyewitnesses put him at the robbery, homicide of the victim. There was a fingerprint on a receipt found in the victim's car that was stolen. He was in possession of the victim's purse and the gun that killed the victim. This is the evidence presented against Mr. Kiles when Brady surfaces, showing that two of the four eyewitnesses had given previous statements that were not very consistent with their trial testimony. And there was some evidence linking the informant—I think his name was— they kept calling him Beanie was his nickname— that he may have had some involvement in the crime. So Mr. Kiles, like Mr. Rimmer, certainly is in a precarious position in that he is in possession of— is when I look at the substance, the corpus of the evidence that purportedly exculpates, I find virtually nothing. What is there in this other stuff? Whether you look at the FDLE report, the names of the FDLE agents mean nothing. So all you really have is that at some point an FDLE report says that there were other suspects. Nothing more. How is that enough? Well, it actually identifies the other suspects. Okay, so they say the other suspects are Jones and Smith. But what is there in the course of inquiry, either by them or what may have come up later, that ties in any palpable way Jones and Smith to this robbery and this homicide? We don't know what ties them. We just know that they were identified— But don't you suppose you have to show something more than that at some point there were suspects? Well, I mean, I sort of envision this as when you're at the trial and the jury's sitting there and you're asking the detective and you're asking the eyewitnesses and you're asking the fingerprint examiner about these other suspects and whether or not lineups were made and why weren't they shown to the eyewitnesses and why was the fingerprint examiner told not to conduct any more fingerprint analysis, even though we had fingerprints at the scene that didn't match Rimmer or Parker. And that, again, goes into Kyle's to show that there's this rush to judgment and then there's a lack of thorough investigation, and so that it undermines the entire investigation that law enforcement conducts. I take it from the record we have in front of us. It's clear that there was no lineup or showup of these suspects to the witnesses in connection with this robbery homicide? That's what the record currently shows. What does the record say we don't know? What does the record say specifically there was no lineup, no showup, and no fingerprints? I believe at the evidentiary hearing we established that the witnesses were not shown those lineups, even though they were put together by FDLE. So what we do know is there was an absence of a lineup and an absence of a showup and an absence of fingerprints, and that's the totality of it. And that at some point someone somehow put in an FDLE report that they were suspects? Right. That really helped me. Is that the totality of what we've got? Yes. I think the crux of it is that these individuals are characterized as suspects. They're on not only the FDLE report but also on the fingerprint analysis report. They're characterized as suspects. They've gone to the length to get their pictures, put them in the lineups. Mr. Ingram is told to interview witnesses and show people the lineups, and then nothing happens. Let me ask just one final question if I can. Collaterally, what does the defense lawyer say about all this, the trial lawyer for the petitioner? Right. So he comes into the evidentiary hearing and says, that to me was not that significant because I was already arguing that he wasn't there and that the eyewitness evidence was not reliable. So to him, he didn't see it as significant. But again, this is someone sitting on a witness stand being asked questions, not having the opportunity. I mean, I objected to this line of questioning and said, this is for the court to determine what significance this would have at this point because he's no longer the trial attorney. He's no longer the person making those judgments and investigating the case. Does he say something along the lines of, even if I had it, I wouldn't have used it? It wouldn't have helped me any? He says that in relation to the Plantation Police Department. Okay, the Meineke muffler stuff. But not with respect to the— He says, if there were other suspects, I would want to know about them. And so just briefly, to talk about the eyewitness testimony, I did want to again emphasize that in kind of— Which ties him to the scene. That is what ties him to the scene. But I think it's important to look at that eyewitness testimony, number one, in these false exonerations that we've seen. The number one factor is faulty eyewitness testimony. And if you look at this eyewitness testimony, we have, from the very beginning, we have problems with the reliability. Davis Burke is shown 50 photographs before she makes the sketch, before she says a single word to the sketch artist. That immediately taints the sketch. Then we have, during the photographic lineup, she's told—she picks a different person as her choice. And she's also told, if you don't see someone exactly like the guy, just pick the one closest to it. We know that that is absolutely prohibited at this point in where we are in sort of the investigation and how to deal with eyewitnesses. So at every step of the way, there was unreliable and suggestive means. And I understand that the Florida Supreme Court didn't find it to be a problem in this case. But I think under the prejudice analysis, you have to consider the totality of that. So I would just ask that I reserve the rest of my time. You have your full eight left. Thank you. Thank you. Ms. Campbell for the State of Florida. Good afternoon. Still good morning. May it please the Court, Leslie Campbell with the Attorney General's Office on behalf of the State. What do you say about the Hearst issue? The State's position is still that the Florida Supreme Court was incorrect in finding retroactivity. However, the rest of what Ms. McDermott said, as far as the state of the law, is correct. Are you seeking cert or anything from the Florida Supreme Court decision that did the pre-post-ring ruling? The State had sought cert on Hearst v. State, and that was denied. Let me sharpen the question. We know on the 26th of June, issue will be joined in a State trial court on the application of Hearst to a post-ring defendant with a verdict of 9-3 by the jury. They're going to seek relief. Is the State going to object? We are still arguing that there should be a harmless error assessment and that it is not just based on the non-unanimous verdict. The answer is yes. We are arguing that point, Your Honor. It's foreclosed by what the Florida Supreme Court ruled, though, right? The state of the law. Aren't you going to tell the circuit court that you're bound by what the Florida Supreme Court has ruled and that there has to be relief granted? Yes. However, our position still is. I understand you think the Florida Supreme Court is wrong, but that's a different issue when you get to the circuit court on the 26th. We must admit to what the state of the law is in Florida. Okay. So if the judge says, I'm granting relief based upon what the Florida Supreme Court has said, if they do that, is that something you are going to seek to appeal to the Florida Supreme Court? No, Your Honor. In the past where we have sought those, where we disagreed and we sought an appeal, we have now withdrawn those appeals. The only reason I ask the questions is I'm trying to figure out whether we have to fuss with this other issue or whether essentially it's going to be rendered moot and rendered moot pretty soon. The state would suggest that this court does reach the issue of ineffective assistance to the counsel because ineffective assistance to the counsel is not a Hearst issue. Ineffective assistance to the counsel. It's a sentencing issue here, isn't it? Well, it's ineffective assistance to the counsel. I know, but it only goes to the sentence. Isn't that right? That is correct, Your Honor. And if the sentence is vacated, if the death sentence is vacated, it's moot, isn't it? Well, not. How could it not be moot? If indeed the state courts say he gets a do-over on the penalty phase, it's of no moment that the lawyer on round one may have screwed up or not. It's of no moment whether his performance fell beneath some acceptable standard or whether there was prejudice shown or not because he gets the relief that you otherwise would have received from a successful Strickland claim anyway. So it has to start penalty phase, square one, do-over. How then could it possibly matter what we say about this Strickland claim? It doesn't necessarily matter to Mr. Rimmer, but case law out of this court explaining what . . . Yes, that would be an advisory opinion for other cases. We can't do that. Yes, Your Honor. Can I go back to the status of the Florida Supreme Court decision on retroactivity? Is that a final judgment now? I do not believe that the time has actually run on a say in Mosley. I may be incorrect in that. However . . . Can you advise us after this hearing if the Florida Supreme Court decision is a final judgment? And then if it's not a final judgment, you need to advise us when you think it . . . what's the time frame for when it will become a final judgment? With regard to any certs that are being filed? Yes. Or that you don't plan to file a cert or whatever the state of Florida . . . we need to know. Yes, Your Honor. And I can just do that by letter? Yes. Yes, Your Honor. And is it Assay or Mosley or both of them that we have to have for the reversal of the death sentence here? Which one is the controlling law? Mosley is the controlling law. Mosley. So, what we mainly . . . I'd like to know about both of them, but I actually have Mr. Assay's case on that panel. So, I just would like to know the status of Mosley and Assay. Yes, Your Honor. If there are no more questions, I'll move to the Brady issue. In this case, the Florida Supreme Court identified the correct law, which was Brady and its progeny . . . and then analyzed the facts that were brought out at the evidentiary hearing in this case . . . and determined that there was no Brady violation. While some of the documents were not turned over, like the FDLE document had not been turned over . . . the bulk of that information was already known to defense counsel. What was known and what wasn't? What wasn't known was the videotape, the attempted enhancement of that videotape. The FDLE documents, if I understand it, and you can help me just piece it together . . . included the names of some FDLE law enforcement folks involved in the inquiry, right? Yes. Was that known or not known? That was not known. Okay. And, it also included suspects, some of whom were different from the people who were ultimately charged. Yes. Right? How many other suspects were mentioned in the FDLE report, other than the people who were charged in this case? That is to say, Rimmer and his associates. I believe there were three that were in the . . . Three others in the report. Three others. However, which wasn't mentioned, I don't believe, during the opening argument here. There were three assailants in this case. Two of which were . . . Two of which were charged. Right. And, one was not. So, they never found the third guy, basically. Never found the third person. I've got a question. Did Parker ever identify who the third person was? He's got a life sentence. I don't believe anyone identified a third person. Did Parker . . . he only got a life sentence. Yes, Your Honor. Was that a plea or did he try to get the death penalty and he didn't get it? They were tried together. They were convicted. I know they had separate . . . It was split. The penalty phase was split. Okay. Was the death penalty sought on Parker but didn't get it? I believe so, Your Honor. He got life. Yes. And, he never said who the third person was either. Not to my knowledge, Your Honor. Okay. Getting back to the suspects, which is the heart of her argument concerning the FDLE report, there were three other suspects who were named in the report. Did counsel have those names on the front end before? No, Your Honor. Because you said that he knew some things and didn't know others. So, he did not know the names of the suspects either. What FDLE was tasked with doing was preparing lineups. What they also did in preparing their report is they took the Wilton Manors Police Department report, which defense counsel did have, and they reincorporated a lot of that into their report. Did the Wilton Manor Police report indicate the names of these three suspects? I don't believe so, Your Honor. Okay. So, the report lays out three names other than the defendant and his confederate here. Yes. What else does it say about those suspects other than . . . We got these other suspects. Here they are, A, B, and C. That's in essence what it has. Does it say anything about lineups, showups, fingerprint analysis, or anything like that? No. The testimony was that these were just the driver's licenses, the photos of these individuals. How did they come to be characterized as suspects by the FDLE in the report? That didn't come out in the evidentiary. There's no record evidence on that? I don't believe so, Your Honor. What we have is the FDLE report, defense counsel looking at it, identifying what he doesn't know, mentioning what he does have, anything with Parker he's not interested in. But he knew nothing about these three, that is to say, name, rank, and serial number. That's correct, Your Honor. All right. What evidence, if any, in this record, either pre or post, is there that ties these other three suspects, A, B, and C, to this crime, other than that they were characterized as suspects in an early FDLE report? Nothing was brought out about that, Your Honor. Is there any reason that was offered in this record about why no fingerprints were taken from them? Does the record reflect it? Not in this record. None of the officers testified at the evidentiary hearing as to why they didn't take fingerprints. Or show up, line up, or show up. Right. Thank you. With regard to, again, staying with the identification, Ms. Burke's composite sketch, the one that she developed, was so closely tied to Mr. Rimmer's physical attributes that the owner of a different audio store recognized him as the person who had a beef with Audiologic, and then brought it to the attention of the owner of Audiologic and, of course, the police. And that's how Mr. Rimmer was developed as the suspect. And, Your Honor— Ms. Davis was shown photos before she gave the sketch artist the description. She was looking at photos, but her description is very solid, Your Honor. And when you tie that to the fact that it was so close that others could recognize Mr. Rimmer, and then when Mr. Rimmer was spotted driving his 1978 Oldsmobile, not the probe that he had used in the robbery, he did throw out three items, the two guns and Mr. Moore's wallet. That's pretty damning evidence. And the firearms were matched up to the bullets that, in fact, were taken from the victims. It was the murder weapon, yes, Your Honor. You said there were two weapons thrown from the car. And the one that was stolen from— But the one weapon, the murder weapon itself, was found after he threw it out of the car. Yes, that was the other weapon. Also, Mr. Rimmer is the one that had the equipment that was stolen, opened up an account with a storage company, signed the report. All of that comes out. He had the Ford probe. That's another car in his name. He is tied to this murder. Why is there no fingerprint evidence since they were in that store for a while? She says there's no fingerprint evidence with the cash register or any fingerprint evidence of him doing the robbery. Is that correct to begin with? Well, there was nothing that could be identified as Mr. Rimmer's. However, there were plenty of fingerprints. This is a business that has many people in and out of it. But why didn't they get Mr. Rimmer's fingerprints at the store, given that he took the gun out of the cash register? Maybe he didn't. Maybe somebody else took it out and gave it to him. There were plenty of prints that might not have been identifiable. It doesn't mean that he didn't leave prints. But there were no fingerprints tying him to the scene, is her point. That is correct. But that doesn't mean that he wasn't there. There's an eyewitness. Do we know from the record that other robbery, whether they were duct tape and the people that were shot in that other robbery, whether they had duct tape and talked a lot face down on the floor and tied and all that? Was the M.O. the same in the other robbery? I do not remember if they were duct taped, Your Honor. However, I do remember something that Mr. Rimmer's photograph was shown, and none of those witnesses could identify him. But there were fingerprints on the stereo equipment in the storage unit. That is correct, Your Honor. That is to say, Mr. Rimmer's prints were found on the stereo in the storage? In the storage unit. Okay. Well, they had a video surveillance of him running in the storage unit. Yes. But it was the stolen equipment from the store. It was the stolen equipment from the store. Right. And as far as the other item that wasn't known, there's a videotape. FDLE tried to enhance it. There's information that the efforts that they took, however, they were unable to enhance the tape, and the original tape as recorded was the item that was put into evidence in this case. With regard to the report of a chop shop and where the murder weapon was initially taken, the defense counsel would not have wanted to put that in to show that Mr. Rimmer's involved in a crime ring or that he had the murder weapon before entering the store. With regard to the, I think there was a fourth thing. The bulk of the information was known to counsel, and therefore it wasn't withheld. It wasn't. Did the district court employ the right standard of review? No, I don't believe so, Your Honor. The district court ignored certain factual findings and ignored, in essence, a credibility finding. Credibility findings is pretty sacrosanct. The Florida Supreme Court looked at what defense counsel said and defense counsel was under oath and he made those representations. It should have been something that should not have opened. The determination of the state habeas court should have been given the deference under ADPA. Yes. Any other questions? Yes, I want to go back to the suspects. You say that are identified the three people that were identified. Is this in the record that lineups, I guess they must have been a photo array lineup, had been prepared? They had the driver's license photos. Okay, not a photo array. I don't believe it was a photo array. I might be misremembering that, Your Honor, but my recollection is they were talking about driver's license photos. Right, well, I just want to be clear on that. It's one thing to say here are three suspects. Their names are A, B, and C. And we have the driver's licenses of each of the three suspects. And quite another thing to say that FDLE law enforcement put together a photo spread of each of the three and others who looked like them. Your Honor, I do. I'm just trying to find out. I do. I take you to be saying it was the former, not the latter. Have I misunderstood that? That is my recollection. However, I want to be honest with the court. I do not recall if there were actually photo arrays done. My recollection is that they were the driver's license photos. I may be incorrect, and if I might also advise the court of that at a later date. Right. Would that be if it's in evidence in this record from the collateral hearing? Yes. Okay, that would be helpful. Thank you, Your Honor. And maybe. A record site, of course. Yes. Right. I'm just trying to make sure I understand there's nothing but the names. I don't, driver's license wouldn't be much, but there's nothing about the suspects other than the names that was lifted over to the FLP or FL. Florida Department of Law Enforcement. FDLE report. That's what we have. We have testimony that these are the photos of those suspects or individuals that have been identified. Okay. I don't have anything else. Thank you, Your Honor. I ask you to affirm. I was going to ask you about. We couldn't find Dr. Jacobson's 2003 forensic report in the record. We can only find the 99 one. I think it's going to be moot now. I will try and locate that and give you a record site. If you know where the 99, let's see. No, excuse me. We found the 99. We couldn't find the 2003. So it's where is the 2003? Her 99 report was much more fulsome about lots of things than necessarily the testimony. So I was trying to compare the two. So I need to know where the 2003 one is in the collateral review record. I will look that up, Your Honor. If it got in it, maybe just have her testimony. I will check, Your Honor. Okay. Thank you. Thank you, Your Honor. Thank you. Just a couple of quick things. These lineups that were made with the other suspects are in the record. In the district court, they were filed as document 16-142. And are they a photo array or are they just driver's license? So they pulled the driver's licenses. So you can see, well, that's Rimmers. But they pulled the driver's licenses. This is, that's Rimmer again. Here's Bernard Gilbert. And then they also put them. No, no, no, but that's not the thrust of my question. They also put them into the lineups. That's what I'm asking. They had a lineup of each of the suspects with five others. Or did they just put the three suspects together in the same photo spread? If I recall, they may have put them into the same photo spread. Okay, I got it. There were several different photo spreads, though, that they did put together. So it's in the district court record, 16-142. This was part of the record that the state filed below. It says Exhibit C, PCR 54. The state filed, so it would have been before the state habeas court. Correct, yes. The other thing I just wanted to briefly address is that there were three assailants, according to the eyewitnesses. But the fact that there were three assailants and that one never was identified certainly shouldn't impact the issue about the other suspects to the extent that if they thought that the third person was, if that was one of the other suspects was the third person, there would be no reason to stop the eyewitnesses from viewing those photos. Yes, I think that is a fair inference that if they thought that any of these three folks, other suspects with the driver's licenses, were the third assailant, they presumably would have shown a spread, line up, or show up of that person to the eyewitnesses in the case. And what the law enforcement had always made clear was their priority was to obtain. We don't know why, but that's a fair inference to draw from this record. But while you're on that, was that photo array or driver's license picture shown to anybody? No, not according to what was revealed during the investigation. They showed it to an eyewitness. An eyewitness said yes, no, maybe, whatever. That is undisputed. That was never shown. Those photographs were never shown to any of the witnesses. Right. And we know that because of what? Because I thought the law enforcement officers were not questioned at the collateral hearing. I know that what had happened was that Detective Lewis was asked at some point by trial counsel, and this was revealed in the post-conviction hearing, if there were any other suspects, and he had said there were not. So that's where I'm taking that from is trial counsel's testimony, that he was unaware of it because Lewis had told him there was nobody out there that they were looking at. Let me state it another way. There's no evidence in the record that these photographs were shown to the eyewitnesses. Correct. Yes. The other thing, I just want to, again, point out that, you know, this notion that Davis Burke's description of Mr. Rimmer was very solid, I don't know how that can hold up when we have her looking at a photo array and choosing another person, and then, according to her sworn statement, being told, your boyfriend picked this guy, and then that's when she picks him. Detective Lewis says he didn't tell her that your boyfriend picked this guy until after she picked Rimmer as her second choice, but her sworn statement is clear, and that is in the record, that she only picked Rimmer because she was told your boyfriend picked this guy. Let me, though, make sure I understand this. What the Supreme Court of Florida said, though, was that on May 4th, two days after the robbery, she provided a description of the shooter. From that, a sketch was drawn. Correct? Yes. And that sketch was then shown to the owner of this store who recognized him as having a beef with Audiologic. Isn't that right? That's right. Okay. And the photo, it has nothing to do with that. No. The only thing in relation to that, the other piece of that that Dr. Brigham talked about at the evidentiary hearing, was she had been exposed to this group of photographs, which is improper, before you sit down with a sketch artist, and that would taint her memory of the actual assailant. I thought the photo, she was shown photos on May 8th. She was, well, she was, no, she was shown . . . According to the Supreme Court of Florida, she was shown photo lineup on May 8th. True. She was shown the photo lineup, but before she did the composite sketch, she was exposed, and that may not be in the Florida Supreme Court opinion, but it is in this record. She was exposed to at least 50 photographs in a mugshot book, and then she sat down with that. That sketch artist, and Dr. Brigham says that . . . Okay, so it wasn't a photo array. It was just looking through a mugshot. Just looking through, and I guess back then you were looking . . . 50 photos. Right, at least 50 photos, and I understand that the individual at the other auto shop said, oh, wait a minute, this guy came in complaining, but certainly, if he had that in his mind, that there was someone who had a beef, then he may have pointed, you know, said, let's figure out who that guy was. So I don't know that we can put a lot of stock in the fact that he identified, looked for the guy who came back in and complained. Can you guys tell me if I looked at that sketch, it would look like him? Personally, I don't think it looks like him, but I think if you look at the . . . What I think is important is Rimmer is legally blind without his eyeglasses, and this is a huge problem because nobody has him wearing eyeglasses, and it would have been impossible for him to co-commit a crime without . . . Was he wearing eyeglasses the day he was arrested in the car? Yes. He had glasses on? Yes, and they made him take them off during the lineup, and I guess he's not wearing them. I don't know if he's wearing them in his driver's license photo, but it clearly says that he has a restriction. He has a restricted driver's license. So there are several problems with the eyewitness testimony. I would ask the court, when you look at this case, the totality of the circumstances, and you look at a case like Kyle's, to find that the district court should have found prejudice and granted a new trial. Okay. Thank you very much. We note your court appointed, and we could not do our work without your assistance, and we thank you, and we always thank the state as well for their public service. At this time, the court is in recess. All rise. Thank you.